We'll hear our argument next in Appeal No. 2006-1391, Sevenson Services v. Shaw Environmental. Mr. Ferguson, if you are ready, please proceed. Thank you, Your Honor. May it please the Court, Brian Ferguson of the McDermott & Willett, Emory v. Sevenson, and with me is Co-Counsel Nelson Correll of the Webster Zine firm. Good afternoon. In 1976, the Court of Claims decided Carrier v. U.S. 534 F. Second 244. The Carrier case is controlling precedent and factually indistinguishable from the case at hand. Okay, well, Counsel, the Carrier case, though, there was no contract provision that specified a particular way in which that was meant to be carried out. Isn't that right? That is correct. There is a provision in the contract that required that the equipment that was at issue in Carrier had to be inspected and approved by the government official who was in charge of the underlying contract. And also in Carrier, you said there's no factual difference, but in Carrier, there were non-infringing alternatives that existed that would have allowed for the fulfillment of the contract, and in this case, to my knowledge, there's no proof of non-infringing alternatives that would satisfy the work plan. There is no evidence that—well, let me step back. There is evidence, Your Honor, undisputed evidence, that the TURC, which is the contract itself, could be satisfied by a non-infringing alternative. Now, could the work plan be satisfied? The work plan specified that phosphoric acid needed to be used. Phosphoric acid is the infringing method, so that is correct, but the work plan itself is not part of the TURC, the contract that contains the authorization and consent clause. So what? So what? I mean, it's a part of—it's an agreement, and they're obligated to use the thing, unlike Carrier, which just gave the government a veto over something which hadn't been approved and didn't obligate them to use that particular method or particular device. They could have used something else instead. They just had to get approval for it. Well, but I respectfully disagree with that, Your Honor, because the contract in Carrier specifically required—and this is at page 248 of the decision—all equipment for use in accordance with provisions of this contract shall become operative only after inspection and acceptance. It gave the government a veto, but that's not the same thing as saying that you had to use that particular equipment. As long as there was other equipment that they got approved, they could have used that, right? They could have, but that's the exact same facts here, Your Honor, because here— It goes on to say in paragraph 3.3, became a separate contract between the government and the contractor, but it is not a contract that contained the authorization and consent clause. The TURC had the authorization and consent clause, and what the TURC required only is that the contractor submit a work plan that would describe how the work plan would meet the requirements of the TURC. Why is this a separate agreement when this is really called for in the agreement itself? Because the work plan itself, the choice of the technology that was going to be used to meet the requirements of the TURC was the choice of the contractor, solely the choice of the contractor. The government could have approved it or could have not approved it. But what difference does it make? If this was part of the contract, that the contractor would submit this plan, the plan would be reviewed, once the plan is approved, then the terms and conditions of that approved plan become part of the obligation under the TURC. I don't agree that it becomes part of the obligation under the TURC, because the work plan itself only required—or the TURC itself only requires that the contractor, in this case Shaw, that the contractor be able to remediate the soil to a level below the EPA requirements. The manner in which the contractor does that was the choice solely of the contractor. And we believe that that is the exact same facts that were in Carrier. Because in Carrier, the contractor, before it could begin removal of the trash from the Army bases, from the Navy base, still had to submit its equipment for approval prior to performing its duties under the contract. So suppose that in the original contract negotiation, the contractor says, you should include this provision in the specs. We think this is a good idea. And the government says, yeah, that's a good idea. We'll include it in the specs. So under those circumstances, 1498 doesn't apply? I think if the government had said in this case that in— No, no. What's the answer to my hypothetical? Could you restate it for me? My hypothetical is, let's suppose that in the original contract negotiation, the contractor asked to have a particular method included in the specs, suggested to the government that the particular method ought to be included in the specs. The government says, okay, that's a good idea. We'll do it. Are you saying that brings it outside 1498? No, I think that that will fall within the scope of 1498. What's the difference between that and this? Because in that case, before the contract is entered into between the government and the contractor, the government understands that a specific method is going to be used, and it requires at that point that that specific method be used once it accepts it. In this case, the TURC has already been signed. The TURC is silent as to whatever technique is going to be used at the sites, and only requires that a work plan be submitted that will effectuate cleanup. Now, the work plan itself is a separate contract between the government and the contractor, and the work plan does not have an authorization consent clause. So it's no different than in Carrier, we believe. So your whole argument depends on treating the work plan as a separate contract. I think that that's key for us because, again, in Carrier, Your Honor, it was undisputed they had to submit the equipment for approval by the government before they could start. And then once the government gives approval, it's not up to the contractor at that point to just willy-nilly be able to change the equipment that was going to be used. So we still say that the facts are indistinguishable between Carrier and here because the work plan is no different than the provision in the contract in Carrier that required that there be approval of the infringing equipment or there be approval of the chosen equipment prior to the contract being performed. Even if we accept your argument that this is a separate contract, this work plan, certainly what was agreed to under the work plan was work performed for the government pursuant to that work plan, and it was done following the government's authorization and consent. So what difference does it make whether it's a separate contract or not to the extent that the government in this case is the beneficiary of this product or service and that the government did expressly authorize and consent that this be performed? Because in that case, Your Honor, under the work plan, there is not an authorization and consent clause in place. So we don't have the language of the authorization and consent clause that is in the specific contract. So what we would have to look at then is whether or not there is implied authorization and consent. And under implied authorization and consent, under the Larson case that we've cited many times in our brief, there is not implied authorization and consent if the choice of the infringing method was the contractor's and there were non-infringing alternatives that were available. Even if there's no authorization and consent clause, if the government has expressly consented, then we're talking about an express consent, not an implied consent. But I think even in that case, Your Honor, the question becomes, and again, if we look at Kerry, if we look at the Larson cases, has the government, did the government authorize or consent to the infringement that is part of the contract in question? And in the hypothetical that we're discussing here, the choice of the infringing method was a choice by the contractor. It was not specified or required by the government. And so that's why I think there is a distinction between the cases, or between the hypothetical and the actual facts that we have here, because the work plan itself was prepared by the contractor. They chose the infringing technology. It was their choice. The evidence is undisputed that the government did not care what was chosen as long as what was chosen was going to be able to remediate the soil to the level specified in the TURC. If this had been called an addendum to the contract rather than a work plan, would your argument be different? I think if it had been called an addendum, it would not be any different, Your Honor, from the Carrier case. The facts there also show that the government had to approve the equipment before it was used. And in Carrier, even with, it was undisputed that the equipment that had been chosen was approved by the government, and yet still authorization and consent was not found in Carrier. So it's a question, I believe, of whether or not the District Court properly followed the Carrier precedent. And I don't think that the facts of this case can be distinguished from Carrier, and I don't think that the distinctions that the District Court raised don't hold water. One distinction that the District Court raised was that the use of the patented apparatus was by the contractor in Carrier and not by the government. That's true, we can see that in Carrier, but that's no different from the facts here. No one has ever said that the government is the one that has actually treated the soil using the infringing method. In fact, the project engineer who was in charge for the Army Corps said, quote, in October 1999, the contractor began its operation of the stabilization system using phosphoric acid at the site. That's a JA-944. They never said that the government is the one performing the operation. So that distinction I don't think holds water. I mean, am I rebuttal? All right. Thank you, Mr. Ferguson. We'll now hear from Mr. Graham. Good afternoon, Your Honors. Mark Graham with the firm of Ludic and Ely Graham, excuse me, in Tennessee. We represent Shaw Environmental in this matter. We have a saying, Your Honor, in Tennessee, that when you're in a hole, you stop digging. And Sevenson seems to want to continue to dig, even though they're obviously in a hole. This new argument that the work plan is somehow a different argument is what we've seen. We've seen that pattern of conduct throughout this argument, which is every time we get to a new stage of the case, we come up with a new argument. Like on this appeal, the argument that it was somehow not for the government was something that was not made below. Now we hear the argument that somehow the work plan is a separate contract. I think the facts and common sense, Your Honors, show very plainly we all learned in law school that when a contract refers to another document, such as the work plan in this case, that it becomes incorporated by reference and becomes a part of the contract. That's common sense. It's black-letter law. We know that to be the case here. It's ludicrous, quite frankly, to take the position that the work plan is somehow a separate contract document. It's dealt with extensively in the overall contract. Apparently, Seminsen has never heard of what's known as a design-build contract, which I'd say this is probably patterned after, where part of the contract function is for the contractor to actually formulate the plan, which he's ultimately bound to adhere to when he constructs the home. This is very similar to a design-build contract concept. Here there's no question and no dispute in the record that the contractor is bound to perform this remediation process by using the process called for in the work plan, that is, the FOSS forecasted, the accused process. Even the government itself agrees that Shaw is contractually bound by the contracts, the PRAC and the TURC, to follow the dictates of the work plan and to use the process called for in the work plan. It's undisputed. So the government itself agrees that this is a contract requirement for Shaw. So our argument, Your Honors, is very simple. It's a very simple situation here, and that's why we think it's appropriate for senior judgment. We have a contract that requires the use of a particular technology. That being the work plan plainly forms a part of the contract, requires the use of FOSS forecasted, which Seminsen claims to infringe its patents. There's no dispute. Between the two contracting parties, Shaw and the government, that Shaw must use the process specified in the work plan. Otherwise it would be in breach of the contract. Seminsen himself admitted this in the proceedings below, that Shaw would be in its breach of contract with the government. Now we hear Seminsen saying, oh, well, I guess if they're in breach of it, we agree they would be in breach of the contract if they didn't use the FOSS forecasted process. But now we're going to say it's a different contract. We've talked in our brief, Your Honor, about the problems in appeal practice when an appellee raises a new argument for the first time on appeal. This is not only a condemned practice, but it's an argument in this case, quite frankly, that doesn't make any sense. Mr. Graham, maybe you can address your cross appeal with respect to costs, expenses, and attorneys fees. Your Honor, with regard to that aspect of our cross appeal, our point is very simple, and that is that the court erred in deeming our motion for sanctions to be moot. We don't really know what the judge's basis for that is. He didn't elaborate on that in his decision. He just simply determined that because I'm dismissing the case under 1498, I deem the motion for sanctions to be moot. And you rely on the Johnson case in that connection, right? I'm sorry, Your Honor? The Johnson case. You rely on the Johnson case. The court did? You did. Oh, we did. Yes, sir. The Sixth Circuit did. The Sixth Circuit did. Yes, sir. But actually, the Johnson case is directly against your position, because what the Johnson case holds is that where a district court erroneously dismisses a sanctions request on the ground that it's moot, in circumstances just like these, the review is nonetheless for abuse of discretion, and the district court will be treated as having denied the sanctions request. Correct? Our interpretation of the case, Your Honor, is that the case holds, just as we've set forth in our brief, that it is error to deem, it can be error, to deem a motion for sanctions to be moot. That's correct. It does hold that. But it goes on to say that nonetheless, the review is for abuse of discretion, and the district court is to be treated as having denied the motion on the merits. That's a problem for you. Are you familiar with that part of the whole thing? I am, Your Honor. That's what they hold, right? But I... Is that what they hold? They do go on and discuss the merits of the motion. And they apply the abuse of discretion standard, right? But I don't see... Yes? Yes, sir, they do. Yeah. But I don't see how that's fatal to our position on this appeal. Well, if we conclude that the district court should be treated as having acted on the merits of this and review it under an abuse of discretion standard, we'd have to be convinced the abuse is discretion in order to reverse, right? Correct. And we believe that it's an abuse of discretion to deem our very serious sanctions motion to be moot simply because the case was dismissed under Section 14. No, no, no, that's a given. That's a given. If we follow the Johnson case, it's a given that he shouldn't have dismissed it as moot. But we nonetheless, under the Johnson case, would treat it as having been denied on the merits and review that action for abuse of discretion. And so why did he abuse his discretion here in denying the sanctions? Your Honor, I understand that the Johnson case talks about that. We didn't cite it for that proposition, obviously. I'm sure you didn't. But we believe that the court may not view that part of Johnson to be the wisest approach. Johnson, with regard to all of its holdings, is certainly not binding on this court. And we think this action of the district court in denying our motion for sanctions is moot in the manner in which it did, without addressing the merits of our motion in any way whatsoever, is not right. Your Honor, this was some serious conduct that we raised in our motion. And some things were done that— Their explanation was that it was inadvertent, right? That's what they said. That was their explanation. The evidence didn't support that, Your Honor. But we didn't get a chance to go there because it was just denied in the grounds that it was moot. Your Honor, there were representations about things that simply don't square up. The attorneys represented that. Mr. Locke, for example, the representative of Severance, who supposedly was— In page 3 of your reply brief, you say, Severance admits, once again, that it intentionally withheld critically important discovery. Where do they admit that they intentionally withheld it? When they state that their representative pulled documents from the document review and did not allow us to review. Well, that happens with every document review. Where's the intentionally refusing to produce something that they knew should be produced? Your Honor, in Ireland— Are you suggesting that they intentionally failed to produce something that they knew should have been produced? Yes, sir. What's the evidence of that? The evidence of that is that the person who supposedly pulled these documents back— Let's look at a couple of things about these documents. First, the documents that were pulled back were extremely important to our defense. They showed pre-critical date commercial uses of the technology claimed in these patents. It's very convenient that this person would have a mental lapse and decide that he needs to pull those documents back as opposed to the others that are post-1993 documents. It's very convenient that that would happen. I took this gentleman's deposition in September of 2004. In September of 2004, this gentleman indicated to me that he didn't know anything about these documents and that basically if I wanted to know where these documents might be, I needed to go ask Mr. Yost, who's someone else that used to work for this company. Yet he supposedly, before I took his deposition, is the one who pulled these documents back. I don't understand the point here. Counsel, here's one problem with our addressing this issue. It's really not very well vetted. So from our standpoint, it's hard to say the district court abused their discretion in denying it because that's a really high burden for us to say the district court met, and yet this issue wasn't really well vetted because he dismissed it for being moot. But it just doesn't seem like there's a very good record for us to be able to conclude if we follow the Johnson line of cases that it doesn't seem like we can really say he abused his discretion based on the record as it now stands. Well, to some extent what Your Honor is saying is the point we're making, and that is to deny a motion for sanctions based on what we believe were serious discovery abuses on the basis that, well, the case is going to be dismissed anyway, is in fact an abuse of discretion, not to actually adjudicate that motion on the merits. But you realize even if we were to remand this case, it's going to go back to the same judge. He's probably going to say you got a dismissal. You realize that, right? He indicated that the first time. He said, well, you won. But our point, Your Honor, is that in our legal system, we think it's probably not a wise system to have if we're going to say to parties who abuse the discovery system that the worst thing that can happen to you is you lose. You had your shot at proving that they intentionally withheld it. You included this stuff in your motion, right? Yes, we did. So it's not as though you didn't have a chance. Well, we feel like, Your Honor, perhaps this court doesn't agree, but we feel that because of the manner in which our motion for sanctions was disposed of, that being determined to be lewd and not elaborating on the reasons why it was not a good motion on the merits is, in fact, an abuse of discretion. You want to reserve the balance of your time? Thank you. All right. Mr. Ferguson? Thank you, Your Honor. I want to address the question about whether or not we've argued that the work plan is not part of the underlying TURP. We've always argued that. You can find the same argument in our reply brief at pages 12-14. But I do want to address this point about the breach of the work plan. I can enter into a contract with a builder to build a house on a lot, and that's one contract. And then I can enter into a different contract with the builder to build a pool. And if the contractor breaches the contract for building the pool, that doesn't mean that they breached the contract for building the house. It's the same situation here. Shaw was required to submit a work plan. That was it. He was required to submit a work plan that was acceptable to the government. They didn't have to choose Simonson's infringing patent method for acceptance. That was their choice. Shaw could be here. So Shaw may breach the work plan if it has to use a different treatment technology. But that doesn't mean that they've breached the underlying TURP because all that the TURP requires is that they leach the soil to below EPA-accepted levels. It was undisputed there are different ways of doing that other than the patent technology. That's what the TURP requires. They do it to the appropriate levels in the soil pursuant to the work plan. So if they breach the work plan, they are breaching the contract, the exact expressed terms of the contract, are they not? But they chose the method and put it in the work plan. But that's a different issue. It's not. They've entered the work plan. Once they've entered the work plan, if they breach the work plan, they are effectively breaching the contract as well because the contract says pursuant to the work plan and they would not be acting pursuant to the work plan and therefore breaching the original contract as well at that point, wouldn't they? Even if we said it was two separate contracts, when the one contract says you have to do a pursuant to the second one, you've now breached both if you don't do a pursuant to the second one. I would say this. If that is the case, then the facts of the case, that's no different than in Carrier. Because in Carrier, they still had to submit the equipment for approval. Once the government gave the approval, they couldn't change the equipment without potentially breaching the governmental approval of the equipment. But just to answer this question, if they breached the work plan by not doing the process that everybody agreed to, are they breaching the original contract? I don't believe they are, Your Honor. I don't believe they are because— The contract says you have to do a pursuant to the work plan. Was Mr. Rice your witness? Mr. Rice was a representative. A 30 B.C. witness. He was a representative of the 7th Senate. He did say that if the contract required them to perform a certain method, that there would be a breach of the contract. I understand that he testified to that. That's correct, Your Honor. But again, I don't think that's— So he said his view is directly contrary to your view. Well, I don't think it is because he's talking about a situation where the contract itself, the TURP requires him to use a specific method. If the TURP had said— No, he said the question is once a process becomes specified in a work plan to be used, etc., etc., would you be free to change? He said no. It becomes a matter of contract, of the contract. Well, see, I would again say that that's right. I mean, I'm not—we've never disputed that once a work plan is in place, they have to perform according to that work plan. The question is whether or not that work plan and the performance of that work plan is required under the TURP and whether or not the TURP has—the authorization and consent clause of the TURP applies. I'd like to address, if I may, the question of the abuse of discretion. I think— Were you— I will. Your Honor, there's no question that Judge Arcaro considered the motion for sanctions on the merits. I agree that the judgment said it was—it was dismissed as moved, but if you look at page 2001, 2002, and particularly 2004 under the joint appendix, the court said, I've got it now. He's referring to the motion, so I'm going to deal with it. And Mr. Graham said, I did not understand that today we were going to argue the merits of the sanctions motion, but it was very clear that they were given the opportunity at the oral argument and that the judge decided on the merits that the motion for sanctions should be denied. Thank you, Your Honor. All right. Mr. Graham, do you have any comment on your comment restricted to Mr. Ferguson's response on the sanctions issue? Oh, okay. You're limited to your—to replying on your cross-appeal. I've had no comments, but, Your Honor, I think the jurors would appraise the sanctions issue. Thank you very much. I thank both counsel. The case is submitted.